FRED H. KAUTZMANN and G. E. VERNET, doing business under the firm name of KAUTZMANN-VERNET LUMBER COMPANY, v. JOSEPH R. FINK, a minor, by his next friend and father, J. KINGSLEY FINK, and

FRED H. KAUTZMANN and G. E. VERNET, doing business under the firm name of KAUTZMANN-VERNET LUMBER COMPANY, v. J. KINGSLEY FINK.

24 So. (2nd) 112                  June Term, 1945
December 4, 1945                          En Banc
Rehearing denied January 10, 1946

*McKay, Dixon & DeJarnette,* for appellants.

*L. J. Cushman* and *William J. Pruitt,* for appellees.

THOMAS, J.:

A most deplorable mishap occurred when a little three-year-old boy was struck by a tractor and trailer and seriously injured. We shall spend no time, in our analysis of the facts, discussing the nature of the injuries or the justness of the amount found by the jury, for we think the outcome of this appeal depends entirely on the sufficiency of the evidence to establish negligence on the part of the driver of the vehicle.

There were introduced in support of the declaration eight witnesses: the mother and father, who told of going to the scene and discovering their child badly injured and of the subsequent efforts on the part of themselves and the physicians to nurse him to recovery; a policeman, who described the scene as he found it when he arrived immediately after the accident; a surveyor, who prepared a sketch of the locality; the driver of the vehicle, who testified only as to its

dimensions; the physician, who described the injuries; the little sister of the victim; and a man who operated a garage. It is the testimony of the last two that we must examine to determine whether the responsibility for the unfortunate happening can be placed on the driver of the vehicle because he was negligent in its operation.

First, let us describe this vehicle. The chassis of the truck was 13½ feet in length, equipped with dual rear wheels, and weighed 4,445 pounds. The trailer drawn by it was a metal frame mounted on two wheels, surmounted by a platform equipped with stanchions on the sides, but not in front and back, and with what appear to be rollers across the bed and the forward end. This trailer weighed 3,000 pounds. The combination was known as a trailmobile, and the total weight was 7,445 pounds.

Confining our examination now to the testimony of the witnesses for the plaintiff, we learn from the patrolman that when he appeared at the locale of the accident shortly after the collision he measured the marks supposed to have been made on the pavement by the wheels of the tractor when the brakes were applied and noted that these wheels had dragged for a distance of fifty-six feet in a northwesterly direction and on a curve away from the right side of the street. The marks indicated that the back wheels of the truck slid twenty-four feet before striking the little boy and thirty-two feet afterwards. Lumber was scattered in front and to the right of the place where it came to rest. From the photographs and the sketch introduced in evidence by the plaintiff it is obvious that the truck was being driven along the right-hand side of the pavement, which was thirty feet wide, and that it started sliding to the rear of a car which was parked on the right-hand side of the street facing in the same direction; that the truck stopped in a position across the left-hand lane with the front wheels just over the edge of the pavement and the rear wheels slightly to the east of the center of the street. According to the testimony of the police officer, the victim was struck by the rear wheels of the tractor, and the driver, when interviewed by him immediately after the accident, stated that at the time he was going twenty-five miles an

hour. The officer said the lawful speed at that place was thirty miles an hour.

We now examine the evidence of the only eyewitness introduced by the plaintiff, the little sister of the victim, who at the time she testified was twelve years old and who was telling of an event which happened three years before, when she was about nine. She was riding her bicycle south on the left side of the street when she saw the truck and trailer about a hundred feet away, approaching from the opposite direction and on the same side of the street. She noticed a little boy between her and the truck, but at such distance that she did not then recognize him as her brother. The lad was midway between the margin of the street and the center line "just trotting along." She saw the vehicle hit the little boy and swerve to her right, or toward the other side of the street. Upon being asked whether he looked to see whether anyone was coming, she replied, "No, he didn't look." This, in substance, is all the testimony of the only eyewitness offered by the plaintiff shedding any light on the conduct of the driver and of the victim at the time of the collision. Even if it is granted that a twelve-year-old child can accurately recall the details of an occurrence witnessed by her when she was but nine years old, still her version failed utterly to show any negligence on the part of the driver.

Bearing in mind the statement of the policeman about the distance that the truck slid after the brakes were applied—in a curve from a point near the parked car to the place where it stopped at the other side of the street—we turn to the only testimony offered in support of the averment of negligence. This was supplied by a man who described himself as the operator of a garage, a business in which he said he had been engaged for about twenty-five years. He claimed to have had experience in adjusting and testing the brakes of automobiles and trucks and to have had some special training in that field. Upon closer examination, after telling that he had served three years with the Buick factory in Detroit, he related that he had not specialized there upon brakes only, but upon the automobile as a whole. He said he was familiar with the brakes installed in 1941 Chevrolet tractor units of

the hydraulic type and that he had "had occasion to become familiar with the distance in which a tractor unit of that sort can be stopped by the application of the brakes on a dry pavement." After this preliminary examination there was propounded the hypothetical question:

"Assume, if you will, Mr. Harrison, that the tractor and trailer unit, which I have shown you a picture of, Plaintiff's Exhibits Nos. 2 and 3, had a combined weight of 7,445 pounds; that is to say, the two units weighed that much; that the tractor weighed 4,445 pounds and the trailer weighed 3,000 pounds, making a total of 7,445 pounds. Assuming, if you will, please, sir, that on the 22nd day of December, 1941, that unit, with *some lumber on it, —here are pictures indicating the amount of lumber,*—assume that that unit was being driven at a rate of twenty-five miles an hour, on a dry pavement, the pavement being asphalt,—within what distance in your opinion could that tractor and trailer unit be stopped by an application of the brakes, *assuming the brakes to be in good working order?"* (Italics Supplied.)

To this he replied that he thought the vehicle could be stopped within thirty or thirty-five feet. He was then asked to assume that the skid marks were fifty-six feet long and to state what, in his opinion, was the speed of the truck which made these marks, to which he answered that he judged it would be "around forty to forty-five miles an hour." On cross-examination he said the more a vehicle weighed the longer would be the distance required to stop it. He admitted that it had been about two years since he had tested a truck and trailer similar to the one we have described. To illustrate the quality of his testimony we give the last five questions propounded to this witness on cross-examination and his answers to them.

"Q. You have already testified that your stopping distance increases in direct ratio to the increase in speed. Now, if you increased the speed twenty miles an hour, but the man only goes twenty additional feet, how will you reconcile that to the jury?

"A. Well, the way I figured it, he went farther than twenty feet.

"Q. He skidded more than fifty-six feet, in other words?

"A. Well, at twenty-five miles an hour he would be—

"Q. I am talking about forty-five miles an hour. At forty-five miles an hour, a man couldn't stop at fifty-six feet, could he?

"A. Well, you would have to figure that out. It would be approximately anywhere from five to ten miles increase.

"Q. It would be a ten-mile increase over the fifteen miles per hour increase, wouldn't it?

"A. No, it wouldn't be that.

"Q. What would it be? You are an expert.

"A. Well, those things you have to figure out,—when it gets up to that fast."

Thereupon the witness was excused without any questions being asked upon redirect examination. The nature of these answers indicates to us that the witness was indulging in pure conjecture. Even assuming that he had had sufficient experience from tests in similar conditions to gauge the speed of a vehicle of this type and under the conditions then prevailing, still it is plain that he could not have accurately answered the question without taking into account as one of the hypotheses the weight of the lumber with which the trailer was loaded. For that information he was simply referred to the pictures indicating "some" amount of the material. In these pictures we see lumber, partly on the truck and partly on the street, but there was no testimony whatever as to its weight or quantity. No one could accurately determine these factors from the pictures even if he were an expert on the subject.

It may be said that generally the kinetic energy to be exhausted in order to bring an automobile to a stop is equal to the frictional work caused by the dragging wheels and that, both being proportionate to the mass, or weight of the car, one counterbalances the other. So, if the load is enlarged and the momentum thereby increased, the pressure on the surface, hence the friction, increases proportionately. The difficulty in applying such a rule here arises from the nature of the tractor-trailer. The brakes of such a unit are applied to the rear dual wheels of the tractor, while the

wheels of the trailer, on which was loaded the lumber, apparently run free. While the energy of forward motion would be increased by the burden, the downward pressure of the brake-equipped wheels, hence the friction, would not, for the simple reason that a great part of the load falls on the unbraked wheels. It is easily seen that the amount of the load would be an important factor in determining speed from the distance required to bring the vehicle to a standstill, because it would augment the momentum but not proportionately add to the friction.

Manifestly, the witness did not have any accurate knowledge of the weight of the lumber when he answered the question about the distance required to stop the vehicle if it was traveling at twenty-five miles per hour. He estimated this at thirty-five feet. He was still without this information when he said that if an additional twenty-one feet was needed to stop, the speed was forty-five miles an hour.

We may say in passing, that the scattering of the lumber in the street is easily understandable. As has been said, there were no stakes in the front or rear of the flat body of the trailer on which the lumber was being carried, and at the front of the platform was a roller which we suppose was used to make easier the loading. By the same token, when the vehicle stopped suddenly the lumber continued in motion over the roller off the platform and past the cab into the street.

Considering the unsatisfactory character of the witness' qualifications to answer the hypothetical question, the weakening effect upon it of his answers on cross-examination, some examples of which we have quoted, and the circumstancestances that no testimony other than his even approached developing the existence of negligence on the part of the driver of the vehicle which hit the little boy, we can come to no other conclusion than that there was failure to prove the case.

It is not hard to visualize from plaintiff's witness alone that the trailer-tractor was proceeding along the proper side of the street when the little boy, "just trotting along" and not looking, started across the street from a point near the parked car; that the driver swerved to the left

to avoid striking him, which caused the vehicle to continue on a curve to the left. This is borne out by the patrolman's reply to the question whether there was anything whatsoever to indicate that the boy came into contact with any portion of the vehicle except the back wheels of the tractor. To this he replied: "There was no marks that I could distinguish anywhere else."

Again we say the proof of negligence hinged on the garageman's estimate of speed, based on the length of the skid marks and incomplete information of the combined weight of vehicle and burden. For the reasons we have given we cannot conclude that this was adequate to support the verdict.

Reversed and remanded.

BROWN, BUFORD and SEBRING, JJ., concur.

CHAPMAN, C.J., TERRELL and ADAMS, JJ., dissent.